UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
MARCUS MICOLO,

                    Petitioner,              MEMORANDUM & ORDER
                                             07-CV-0449 (JS)
          -against-

STATE OF NEW YORK

                    Respondent.
---------------------------------X
APPEARANCES:
For Petitioner:     Marcus A. Micolo, pro se
                    Central New York Psychiatric Center
                    P.O. Box 300
                    Marcy, New York 13403

For Respondent:     Glenn Green, Esq.
                    Assistant District Attorney
                    Criminal Courts Building
                    200 Center Drive
                    Riverhead, New York 11901

SEYBERT, District Judge:

          Pending before the Court is Marcus A. Micolo's

Petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.   For the reasons set forth herein, the Petition is

DENIED.

BACKGROUND

I.   Robbery, Investigation, and Arrest

          On November 6, 2001, Petitioner used a slim jim and

screw driver to steal a car from a shopping-center parking lot.

Petitioner then drove the car to the Green Point Savings Bank in

Rocky Point, Long Island, and proceeded inside.   There,

Petitioner leapt over the counter, ordered two tellers to empty their cash drawers, and threatened to kill them. Witnesses testified that Petitioner put his hand in the front pocket of his sweatshirt, thus indicating that he was armed. After placing the money in a bag, Petitioner leapt back over the counter, exited the bank, and fled in the stolen car. The robbery was over in roughly one minute.

Four cameras captured the crime. Two video cameras in the ATM vestibule (the "Vestibule Cameras") filmed Petitioner entering and exiting the bank (the "Vestibule Footage"). In addition, two 35 m.m. cameras in the bank's interior ("Interior Camera One" and "Interior Camera Two", or collectively "Interior Cameras") recorded Petitioner as he fled from behind the teller counter. Interior Camera One, positioned above the front door and looking backward into the bank, showed the teller counter, part of the area behind the counter, and the line area in front of it. This camera recorded images (the "Interior Footage") of Petitioner leaping back over the counter and fleeing through the front door. Interior Camera Two was positioned in the rear of the bank and showed roughly the same area as Interior Camera One, but from the opposite angle. Interior Camera Two also filmed the robbery (the "Lost Footage"), but the film was

destroyed before it was developed.[1]  What is certain is that, unlike the Vestibule Cameras, the Interior Cameras were not constantly recording; rather, they only began recording after a bank employee pressed the silent alarm.  So, exactly what Petitioner did while behind the counter was never recorded by any camera.

When Suffolk County police arrived at the bank, they took custody of the Vestibule Footage.  The film from the Interior Cameras, however, needed developing by the bank's security company.  A security company employee collected the Interior Footage and the Lost Footage from both cameras, but later only returned the Interior Footage, from camera one, to the bank.  (See Tr. Vol. 2, 19-30.)

On November 8, 2001, police located Petitioner's getaway car less than two miles from the bank.  Inside, they found cash stained with dye from exploding packs, later determined to be the bank's.  The same day, Petitioner's acquaintance, Michael Martino, made a statement to the police that Petitioner told him about robbing the bank.  Police also learned of a federal warrant for Petitioner for violating his probation, which was imposed as a result of a prior bank robbery in Florida.

---

[1] What was depicted in the Lost Footage remains unknown.

Having been informed by Martino that Petitioner would be at Martino's residence on the night of November 11, 2001, the police staked officers to wait there in an unmarked car. When Petitioner arrived, they detained him. During a search, the officers recovered a slim jim stained with dye and a screwdriver. Dispatchers had informed the officers that Petitioner was wanted for the robbery, as well as for the federal probation violation. Before taking Petitioner to the police station, however, the officers only told Petitioner, on instruction, that he was wanted for the probation violation. (See Hr'g Tr. 62-63.)

## II. Interrogation and Confession

Once at the station, after informing Petitioner of his rights, detectives interrogated him. Afterward, Petitioner signed sworn, written statements that he had stolen the car to perpetrate the robbery, that he had robbed the bank, and that during the robbery he had his hand in his pocket but did not have a gun. (See Tr. Vol. 3, 731.) Detectives took Petitioner's boots for comparison with a print that was left on the bank's counter. The police never took Petitioner to be arraigned on the federal warrant. (See Hr'g Tr. 160-65.)

## III. Indictment and Pre-Trial Suppression Hearing

The Suffolk County Grand Jury indicted Petitioner for Robbery in the First Degree for robbing the bank while

displaying what appeared to be a firearm. Additionally, the Grand Jury indicted Petitioner for Unauthorized Use of a Motor Vehicle in the First Degree for stealing a car with intent to use it during the commission of a robbery. Petitioner was arraigned on the indictment on November 27, 2001.

From January 13 to January 15, 2003, the County Court of Suffolk County, New York, conducted pretrial hearings in response to defense motions to suppress, as products of an illegal arrest, the slim jim, boots, and written statements. The arresting officers and interrogating detectives testified, and the defense played the dispatch tape from the time of the arrest. At the close of the evidence, the defense argued that, because the arresting officers, upon instruction, intentionally concealed from Petitioner that he was wanted for the robbery, telling him only that he was wanted on the federal probation warrant, and because Petitioner was never brought into federal custody, Petitioner's arrest was pretextual and thus illegal. (See id. at 153-55.) The court, however, denied Petitioner's motion because probable cause existed to arrest him for both the robbery and on the warrant, and Petitioner's confessions were voluntarily and intelligently made. (See id. at 160-65.)

III. Mini-Hearing, Trial, Conviction, and Sentencing

Jury selection began on March 17, 2003. Despite discovery demands made in early 2002, the prosecution had never

5

disclosed possession of the Vestibule Footage, nor had it sought to obtain the Interior Footage. In fact, the Prosecution did not possess the Interior Footage until February of 2003, and only turned it over to the defense, along with the Vestibule Footage, on the eve of trial. Apparently, the prosecution claimed that it was not even aware of the existence of Interior Camera Two, or the Lost Footage, until March 19, 2003, while jury selection was ongoing. (<u>See</u> Tr. Vol. 2, 19.) In response to these revelations, the trial judge conducted a "mini-discovery hearing" (the "Mini-Hearing"). (<u>Id.</u> at 14.)

At the opening of the Mini-Hearing, defense counsel moved for a mistrial based on the prosecution's alleged discovery violations; specifically, Petitioner argued that the Interior Footage and the Lost Footage could have been exculpatory. (<u>See</u> <u>id.</u> at 52.) The court denied the motion because evidence had not, as yet, been presented to the jury, and the violations could be remedied without prejudice to Petitioner. (<u>See</u> <u>id.</u> at 58.) The court did, however, grant funds to the defense to hire an investigator to make any necessary inquiries about the cameras. (<u>See</u> <u>id.</u> at 65.)

During the Mini-Hearing, both the head of the security company (the "Security Head") and the detective in charge of the investigation (the "Lead Detective") testified. The Security Head testified that the Interior Footage was developed first,

yielding images of Petitioner.  He added that, when good images of a perpetrator have been recovered from one camera, the company's typical policy was not to develop, or even review, film from other cameras unless requested to do so, and to discard any such film within a year.  He also testified that the Lost Footage would have shown the same thing as the Interior Footage, but from the opposite angle.  (See id. at 75-102.)  The Lead Detective testified that, had the police not rapidly developed a suspect as a result of Martino's statement and Petitioner's arrest, they would have more vigorously pursued the film from the Interior Cameras.  The detective also testified that, generally, the police department only sought such photographic evidence in order to generate wanted flyers, which were not needed here.  (See id. at 108-10.)

At the close of the Mini-Hearing, Petitioner sought an adjournment to give the defense time to conduct an inquiry into the Lost Footage, when the alarm was pressed, and issues surrounding the discovery violations.  (See id. at 120-131.) Counsel moved for dismissal of the indictment or, in the alternative, a ruling precluding the prosecution from introducing the Vestibule and Interior Footage and directing that an adverse inference charge be submitted to the jury.  (See id. at 133.)  While finding a "gross violation of the discovery statute," the court also found that the violations were made in

good faith. Thus, the court denied an adjournment on the motion to dismiss; however, the court precluded the prosecution from admitting both the Vestibule and Interior Footage, and agreed to submit a jury charge that (1) important evidence that could have been presented was lost, and (2) the jury was entitled to draw all negative inferences warranted by that fact. (See id. at 148-50.)

At trial, Petitioner objected to many of his counsel's decisions. Twice, counsel asked questions of a witness at Petitioner's behest but against his own advice. (See id. at 352-53; Tr. Vol. 3, 672-73). Petitioner further insisted, despite rulings that the prosecution could not discuss his criminal history in detail, that the details of his convictions should be brought in. Petitioner also wanted the suppressed evidence admitted. (See Tr. Vol. 2, 375-77.) Eventually, these disagreements resulted in Petitioner's seeking, on the second day of the prosecution's case, to defend himself pro se. The court denied this request as untimely. (See id. at 473-83.) Later, counsel informed the court that its investigator had found only two cameras in the bank. Petitioner insisted, nevertheless, that more cameras were visible on a video made by the investigator. (See Tr. Vol. 3, 498-99.)[2] Counsel and

---

[2] The investigator discovered that what appeared to be additional cameras in the video were, in fact, lights and motion detectors. (Tr. Vol. 2, 500-01.)

Petitioner also disagreed as to whether counsel should ask witnesses about the number of cameras and the Lost Footage. Counsel resisted doing so on the basis that such questions might lead to readmission of the precluded evidence. (See id. at 513.) Petitioner and counsel also disagreed on whether to call certain witnesses. (See id. at 765.)

Finally, Petitioner testified against counsel's advice. On the stand, Petitioner admitted to every aspect of the robbery except simulating a weapon. Petitioner also claimed that his statements to the police were coerced because he was denied use of a bathroom, water, a phone call, and a lawyer, and he was hit twice in the face and grabbed by his neck. (See id. at 780-82.) As part of his testimony, Petitioner also succeeded in having the Vestibule and Interior Footage admitted. In response to Petitioner's claim of coercion, the prosecution mounted a rebuttal. Defense counsel did not move for dismissal at the close of the rebuttal case.

Ultimately, the jury returned a guilty verdict on both counts. (Id. at 1047.) While Petitioner testified that he did not simulate having a firearm, all five witnesses to the robbery testified that Petitioner had appeared to have one. (See id. at 932-35.) At sentencing, the prosecutor asked for the maximum sentence, a determinate 25 years, on the basis that Petitioner was a second felony offender. (See Sent'g Tr. 11.) While

defense counsel sought leniency (id. at 14-15), the judge granted the prosecution's request, and sentenced Petitioner to determinate sentences of twenty-five years for the robbery and three-and-one-half to seven years for unauthorized use of a motor vehicle, running concurrently (id. at 29-30).

IV. Post-Conviction Proceedings

After sentencing, Petitioner challenged his conviction through two motions pursuant to N.Y. CRIM. PROC. LAW § 440.10. The basis for the first was prosecutorial misconduct and ineffective assistance of counsel. Following denial of that motion, Petitioner moved a second time on the basis that the court failed to inquire into a conflict of interest between Petitioner and trial counsel. That motion was also denied. (See Pet. 4; Resp's Aff. ¶¶ 43-44.)

In addition, Petitioner appealed his conviction to the Supreme Court of New York, Appellate Division. Pro se and represented by new counsel, Petitioner raised the following arguments: (1) legal insufficiency of the evidence to support the verdict; (2) unlawful arrest; (3) his constitutional right to self-representation had been violated; (4) ineffective assistance of trial counsel; (5) his counsel was impaired by a conflict of interest; (6) prosecutorial misconduct; (7) the trial court erred in not granting an adjournment; (8) speedy trial violation; and (9) failure to give a proper jury charge.

10

(See App. Br.; App. Pro Se Br.)   The court ruled that
Petitioner's arrest on the federal warrant was lawful; that the
prosecutorial misconduct, sufficiency of the evidence, and jury
charge claims were unpreserved for appellate review; and that
Petitioner's remaining claims were without merit.   People v.
Micolo, 818 N.Y.S.2d 230, 231-32 (App. Div. 2006).   The New York
State Court of Appeals denied leave to appeal.   See People v.
Micolo, 855 N.E.2d 806, 7 N.Y.3d 815, 822 N.Y.S.2d 490 (2006).

On January 30, 2007, Petitioner filed this Petition
seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
Petitioner asserts the following grounds: (1) trial counsel was
impaired by a conflict of interest; (2) ineffective assistance
of trial counsel; (3) violation of his right to self-
representation; (4) speedy trial violation; (5) violation of due
process; (6) prosecutorial misconduct; (7) improper jury charge;
(8) and failure to suppress evidence as the product of an
unlawful arrest.

DISCUSSION

I.   Standard Of Review Under 28 U.S.C. § 2254(d)(1)

Under the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"), a federal court may grant a writ of
habeas corpus to a state prisoner when prior state adjudication
of the prisoner's case "resulted in a decision that was contrary
to, or involved an unreasonable application of, clearly

11

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005). A "state-court decision involves an unreasonable application of [the Supreme] Court's clearly established precedents if the state court applies [them] to the facts in an objectively unreasonable manner." Id. Clearly established Federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Yarborough v. Alvarado, 541 U.S. 652, 660-61, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (internal quotation marks omitted).

## II. Sixth Amendment Grounds

Petitioner asserts four Sixth Amendment grounds to support his Petition. Petitioner argues that: (1) his trial counsel was impaired by a conflict of interest, arising out of tactical disagreements between Petitioner and counsel, and that the court failed in its obligation to investigate it; (2) his counsel's incompetence, as well as the tactical disagreements,

rendered his assistance of counsel ineffective; (3) the trial judge's denial of his request to defend himself pro se violated his right to self-representation; and (4) the delay between his arrest and trial violated his right to a speedy trial.

A.    Conflict Of Interest

1.    Required Showing

When a criminal defendant's counsel actively represents conflicting interests, and that conflict of interest adversely affects counsel's performance, the Sixth Amendment is violated.    See Cuyler v. Sullivan, 446 U.S. 335, 348-50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).    Whereas in a claim of ineffective assistance of counsel it is necessary to prove that counsel's defective performance likely affected the outcome of a trial, in a claim that counsel's performance was defective because of a conflict of interest, relief is available without establishing an effect on the outcome.    See id. at 350.    See also Mickens v. Taylor, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[3]    Finally, a trial

---

[3] That is to say, it is not enough to show merely that counsel had a conflict of interest; rather, a defendant must show that counsel had a conflict of interest that actually affected his performance.    A defendant need not show the likelihood of a different outcome absent this diminished performance. The Supreme Court treats conflict of interest claims as a subset of ineffective assistance claims, and considers the rule that prejudice need not be shown as an exception to the Strickland requirement of showing both unreasonable performance and a prejudicial effect.    See Mickens v. Taylor, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) (noting that in conflict of interest claims, prejudice is presumed).

court is constitutionally obligated to investigate timely objections to counsel's representing conflicting interests. See Cuyler, 446 U.S at 346-47.

The Supreme Court has considered the conflict-of-interest issue in scenarios in which counsel's obligation to one client was at odds with his obligation to another, creating a question of whether this divided loyalty diminished counsel's performance. See, e.g., Mickens, 535 U.S. 162 (representation of defendant in homicide trial by counsel who had once represented victim); Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987) (representation of codefendants by partners in the same law firm); Cuyler, 446 U.S. 335, (representation of codefendants by same lawyers in separate trials).

2. <u>Here, No Conflict Of Interest Existed.</u>

Here, Petitioner argues that his trial counsel had a conflict of interest primarily because of his disagreements with counsel about whether to seek preclusion of the Vestibule and Interior Footage. (Pet. 7.) There is no basis, however, to conclude that counsel's loyalty was divided by obligations to another client, let alone that such divided loyalty impaired his performance. Thus, Petitioner's claim should be considered not as one of conflict of interest, but under the rubric of ordinary

ineffective assistance of counsel claims.[4] Therefore, the Petition must be DENIED on this ground.

   B.   Ineffective Assistance Of Counsel

      1.   Required Showing

   The Sixth Amendment guarantees that in "all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. Further, "it has long been recognized that the right to counsel is the right to the effective assistance of counsel." United States v. Cronic, 466 U.S. 648, 654, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) (internal alterations omitted). To obtain reversal of a conviction on the basis of ineffective assistance of counsel, a criminal defendant must show: "that counsel's performance was deficient," and "that the deficient performance prejudiced the defense." See Strickland, 466 U.S. at 687.

   With respect to the first prong of the Strickland analysis, the convicted person must show "that counsel's representation fell below an objective standard of reasonableness." Id. at 688. In making its assessment, the

---

[4] See United States v. Moree, 220 F.3d 65, 69-70 (2d Cir. 2000) ("Because under Cuyler the defendant benefits from a presumption of the prejudice that he must affirmatively prove under Strickland, courts have noted the incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims."); United States v. White, 174 F.3d 290, 296 (2d Cir. 1999) ("[Defendant] merely expressed disagreement with his attorney over whether to file certain motions, to pursue certain evidentiary leads, to object to the introduction of certain evidence at trial, and to call certain witnesses at trial and at a sentencing hearing. A defendant's decision to raise complaints of this nature before the trial court does not give rise to a conflict of interest . . . .").

court "must be highly deferential," evaluating decisions from "counsel's perspective at the time[,]" id. at 689, and indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. In other words, the burden is on the claimant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted). Finally, while an attorney must consult with his client and obtain his consent with respect to such fundamental determinations as "whether to plead guilty, waive a jury, testify in his . . . behalf, or . . . appeal," counsel is not obliged "to obtain the defendant's consent to every tactical decision." See Florida v. Nixon, 543 U.S. 175, 187, 125 S. Ct 551, 160 L. Ed. 2d 565 (2004) (internal quotation marks omitted).

2. Petitioner Cannot Show Ineffective Assistance Of Counsel

Here, counsel's conduct was reasonable. Petitioner claims that counsel pursued a different trial strategy than he desired. However, counsel and Petitioner's overall strategy was the same: contest only the issue of whether Petitioner represented having a gun.[5] Petitioner argues that counsel should have sought an adjournment to investigate the discovery

---

[5] This fact also belies Petitioner's contention that counsel would not "pursue raising any defense favorable to the defendant." (Pet. 7.)

violations; however, such an application was unnecessary, as Petitioner had already made it. (Tr. Vol. 2, 120-131.)

Additionally, Petitioner makes numerous claims of incompetence surrounding his counsel's handling of the camera evidence. He claims that counsel sought preclusion against his wishes. However, counsel was not obligated to obtain Petitioner's consent for this tactical decision. Furthermore, it is likely, given that the Interior Footage did not show Petitioner behind the counter or before his flight, that the prejudicial effect of these images would outweigh their dubious exculpatory nature. Petitioner also argues that counsel should have further investigated the Lost Footage. Counsel's investigation, however, yielded no significant information, and revealed that the discovery violations were unintentional. See Wiggins v. Smith, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) ("[A] court must consider not only the . . . evidence already known to counsel, but also whether [that] evidence would lead a reasonable attorney to investigate further.").

Furthermore, Petitioner takes issue with counsel's cross-examination tactics. He contends that counsel should have asked about custody procedures for the film, the camera system, and otherwise probed the discovery failures. And Petitioner points to a portion of the transcript where counsel caught a

witness in a contradiction, but declined to pursue the matter. However, counsel avoided asking about the cameras to prevent readmission of the precluded evidence, and let the contradiction stand so as not to give the witness an opportunity to explain herself.[6]

Petitioner offers no basis to conclude that other tactical choices--calling no witnesses and admitting no evidence, not seeking to preclude all testimony as to events behind the counter, and not pursuing a charge on the confession's voluntariness—-were unreasonable. Petitioner cannot overcome the presumption of reasonable performance simply by pointing to putative failures.

### 3. Petitioner Cannot Show Prejudice

Even if counsel's failure to move for dismissal after the prosecution's rebuttal was objectively unreasonable, Petitioner has not shown that this alleged failure prejudiced him. Therefore, it is not a basis for granting his Petition.

An error by trial counsel warrants setting aside a conviction only where a defendant can affirmatively prove that the error had an effect on the judgment. See Strickland, 466 U.S. at 691, 693. To prove such an effect, the defendant "must

---

[6] The exchange, between counsel and a witness to the robbery, went as follows: "Q. Now, I noticed when you demonstrated, you had your right hand in your pocket-- A. It was the left [hand in Petitioner's pocket]. Q. You are certain about that? A. Yes, I can tell you why, if you want to know. Q. No, that is all right." (Tr. Vol. 3. 527-28.)

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. To that end, a defendant must prove a "probability sufficient to undermine confidence in the outcome." Id.

Here, there is no reason to think that the court would have granted a motion to dismiss. Ample evidence supported a guilty verdict. Petitioner confessed to (1) the robbery, (2) stealing the car to commit the robbery, and (3) placing his hand in his pocket. Moreover, counsel met no success in eliciting testimony that the confessions had been coerced. Martino testified that Petitioner confided to him about the robbery, and Petitioner admitted that he made threats to kill. Five witnesses to the robbery testified that Petitioner represented having a gun, and that they believed Petitioner had a gun, thereby confirming the voluntariness of the admissions in the confession. Finally, even if trial counsel had moved to dismiss the indictment, the outcome of Petitioner's appeal would have been the same: the Appellate Division ruled that the sufficiency claim was procedurally barred and without merit. Micolo, 818 N.Y.S.2d at 232. Therefore, the Petition must be DENIED on this ground as well.

C.  Petitioner's Right To Self-Representation Was Not
    Violated

In Faretta v. California, the Supreme Court held that
the Sixth Amendment guarantees criminal defendants the right to
conduct their own trial without assistance of counsel.  422 U.S.
806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).  Where a defendant
indicates his knowing and intelligent desire to relinquish the
benefits of the assistance of counsel, "although he may conduct
his own defense ultimately to his own detriment, his choice must
be honored."  See id. at 834.  This protection, however, is not
absolute: an accused has a Sixth Amendment right to conduct his
own defense only if he knowingly and intelligently forgoes his
right to counsel and is able and willing to abide by rules of
procedure and courtroom protocol.  See McKaskle v. Wiggins, 465
U.S. 168, 173, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984)
(construing Faretta, 422 U.S. 806).

The right, as articulated in Faretta, differs from the
right sought by Petitioner here.  In Faretta, the defendant
indicated his desire to proceed without counsel "weeks before
trial."  Faretta, 422 U.S. at 835.  However, the Supreme Court
has never held that when a defendant invokes his right to self-
representation after the conclusion of jury selection and two
days into the prosecution's case in chief, his request must be
granted without consideration of the orderly and efficient

administration of justice.[7]  Thus, the trial court's denial of Petitioner's request as untimely, and the Appellate Division's affirmance of that order, did not result in a decision contradictory to clearly established federal law as determined by the Supreme Court of the United States.[8]  Therefore, the Petition must also be DENIED on this ground.

D.    Speedy Trial Claim

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ."  U.S. CONST. amend. VI.    To determine whether this right has been violated, the Supreme Court has adopted a balancing test.  See Barker v. Wingo, 407 U.S. 514, 519, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).    Courts must weigh whether: (1) the delay

---

[7] In dicta in Martinez v. Court of Appeals of California, the Supreme Court opined, "As the Faretta opinion recognized, the right to self-representation is not absolute.  The defendant must voluntarily and intelligently elect to conduct his own defense, and most courts require him to do so in a timely manner."  528 U.S. 152, 161-62, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (emphasis added and internal citations and quotation marks omitted).

[8] While only Supreme Court precedent is controlling when habeas petitions are brought by state prisoners pursuant to AEDPA, the Court also notes that the trial court's denial of Petitioner's request was entirely consistent with the post-Faretta decisions of the Second Circuit.  See United States v. Stevens, 83 F.3d 60, 66-67 (2d Cir. 1996) ("[O]nce a trial has begun, a defendant's right to represent himself is sharply curtailed and the judge considering the motion must weigh the prejudice to the legitimate interests of the defendant against the potential disruption of proceedings already in progress.") (internal quotation marks omitted); Williams v. Bartlett, 44 F.3d 95, 99 (2d Cir. 1994) ("A criminal defendant must make a timely and unequivocal request to proceed pro se in order to ensure the orderly administration of justice and prevent the disruption of both the pre-trial proceedings and a criminal trial . . . .  Distinct considerations bear upon requests made after a trial has begun."); Sapienza v. Vincent, 534 F.2d 1007, 1010 (2d Cir. 1976) (noting that Faretta does not involve motions to proceed pro se made after commencement of the trial).

before trial was uncommonly long; (2) the government or the criminal defendant is more to blame for that delay; (3) the defendant asserted his right to a speedy trial in due course; and (4) the defendant suffered prejudice.  See Doggett v. U.S., 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). The first inquiry, as to the length of the delay, is a threshold issue.  See id. at 651-52 ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between the accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness.")  (internal citations and quotation marks omitted); Barker, 407 U.S. at 530.  However, there is no precise formula for determining what constitutes a presumptively prejudicial delay.  See, e.g., id. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.").

Here, more than sixteen months elapsed between Petitioner's arrest and the start of his trial.  Petitioner has made no attempt to show that this delay was uncommonly long.[9]

---

[9] Petitioner's charges were serious, and the prosecution of his case required laboratory analysis of several items.  But whether a sixteen-month delay is beyond the threshold is unclear based on recent case law.  See United States v. Vassell, 970 F.2d 1162, 1164 (2d Cir. 1992) (noting consensus that a delay of over eight months meets the threshold requirement).  But see Scott v.

But even if Petitioner could show sufficient delay to trigger a speedy trial analysis, the other <u>Barker</u> factors do not weigh in his favor.  The prosecution announced its readiness for trial on December 3, 2001.  From that date, the record indicates that at least twelve months of the intervening delay came by request, or on consent, of Petitioner.  And Petitioner did not file a speedy trial motion until February 25, 2003, some fifteen months after his initial incarceration.  (<u>See</u> Aff. in Opp. to Speedy Trial Mot. 4-8.)  Finally, nothing in the record indicates that Petitioner was prejudiced by this delay.  Accordingly, the Petition must be DENIED on this ground.[10]

## III. <u>Due Process Claim</u>

"[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension." <u>Wainright v. Goode</u>, 464 U.S. 78, 83, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983).  Where disclosure of evidence is concerned, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded."  <u>Wardius v.</u>

---

<u>Walker</u>, No. 01-CV-7717, 2003 WL 23100888, at *6 (Dec. 30, 2003 E.D.N.Y.) (finding no threshold showing where thirteen-month delay before trial involving serious criminal charges, pre-trial hearings, and DNA testing).

[10] <u>See</u> <u>Thomas v. Phillips</u>, No. 04-CV-0906, 2006 WL 39239, at *9-10 (Jan. 5, 2006 E.D.N.Y.) (finding no constitutional violation when eight months of twenty-two-month delay was attributable to petitioner and where motion for speedy trial was not made until fifteen months after arrest); <u>McKenzie v. Herbert</u>, 969 F. Supp. 1, 3-4 (E.D.N.Y. 1997) (finding no constitutional violation arising from fifteen-month delay where a substantial portion was attributable to petitioner's actions, where petitioner did not assert his right to speedy trial until thirteen months after initial incarceration, and where petitioner articulated no specific prejudice resulting from the delay).

Oregon, 412 U.S. 470, 474, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973). Furthermore, even though Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), forbids concealing evidence favorable to the accused, there is "no general constitutional right to discovery in a criminal case, and Brady did not create one." Weatherford v. Bursey, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977).

Petitioner appears to claim that the judge's failure to grant an adjournment so that he could examine the footage was a violation of his due process rights. The judge did, however, order that Petitioner be afforded an opportunity to view the footage from the vestibule cameras (T. Vol. 1, 21), authorized funds for a private investigator to investigate the matter of the Interior Cameras, and precluded the prosecution from offering any of the camera evidence. Petitioner cites no authority and gives no explanation as to how these remedies failed to cure any procedural deficiencies. Nor can he argue that the belatedly disclosed material was potentially exculpatory, as the Vestibule Footage only showed Petitioner entering and leaving the bank, and the Interior Cameras did not begin to shoot until Petitioner was fleeing. Thus, the images would have had no bearing on the issue of whether Petitioner represented having a firearm while he was behind the counter. Accordingly, the Petition must be DENIED on this ground as well.

IV.  Remaining Claims

Petitioner makes several additional claims.  First, he
argues that the trial court improperly charged the jury, and
that the discovery violations and statements made by the
prosecutor during summation amounted to unconstitutional
prosecutorial misconduct.  Next, he argues that there was
insufficient evidence that he represented having a firearm to
support a verdict of guilty beyond a reasonable doubt.  Finally,
Petitioner argues that certain evidence should have been
suppressed as the product of an illegal arrest.

A.  Procedural Default

In the context of federal habeas petitions brought by
state prisoners, an independent and adequate finding by the
state court that a claim was procedurally barred by state law
prevents subsequent habeas review of that claim in federal
court.  See Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct 1038,
103 L. Ed. 2d 308 (1989).  In addition, federal habeas review is
foreclosed where a state court has relied on an independent and
adequate state procedural ground, "even where the state court
has also ruled in the alternative on the merits of the federal
claim."  Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996).  To
overcome this barrier to federal review, a state prisoner must
"show cause for the default and prejudice attributable thereto,
or demonstrate that failure to consider the federal claim will

result in a fundamental miscarriage of justice." <u>Harris</u>, 489 U.S. at 262 (internal citations and quotation marks omitted).

Here, Petitioner's claims relating to the jury charge and prosecutorial misconduct are barred. On direct appeal, the Appellate Division of the New York State Supreme Court ruled that Petitioner's claims on these grounds were "unpreserved for appellate review." <u>Micolo</u>, 818 N.Y.S.2d at 232. And Petitioner has not attempted to show cause for the defaults or prejudice, nor has he attempted to show that failure to review the claims would result in a fundamental miscarriage of justice. Thus, this Court may not exercise jurisdiction over these claims.

Furthermore, this Court may not review Petitioner's claim that there was insufficient evidence to support the verdict. As stated above, Petitioner's counsel failed to make a motion to dismiss following the prosecution's rebuttal testimony. As a result of this failure to make a contemporaneous objection to the sufficiency of the evidence, the Appellate Division ruled that this contention was "unpreserved for appellate review." <u>Id.</u> at 231. The fact that the Appellate Division went on to rule on the merits of the claim "[i]n any event" does not change the fact that an adequate and independent state procedural rule bars this claim. <u>Id.</u>; <u>see</u> <u>Velasquez v. Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990) (finding an adequate and independent state procedural bar where Appellate

Division ruled federal claims were unpreserved while, "in any event," finding them to be without merit). And, even if counsel's conduct in failing to re-apply for dismissal of the indictment was unreasonable, Petitioner nevertheless cannot show cause for the default because this error did not rise to the level of ineffective assistance of counsel. See McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) ("Attorney error short of ineffective assistance of counsel . . . does not constitute cause and will not excuse a procedural default.") (internal alterations, citations, and quotation marks omitted); supra Section II.B.2-3. Finally, Petitioner cannot show that failure to review this claim might result in a fundamental miscarriage of justice.

B.    Fourth Amendment Suppression Claim

In order to deter law enforcement from disregarding the Fourth Amendment protection against unreasonable searches and seizures, evidence obtained in violation of the Fourth Amendment may be excluded at trial as a form of sanction. See Stone v. Powell, 428 U.S. 465, 492, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). In the context of federal collateral review of state-court convictions, however, the deterrent justification for such a sanction diminishes greatly, and so district courts have limited authority to inquire into Fourth Amendment claims brought by state habeas petitioners. See id. at 493-94; Gates

v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) ("The basic inquiry is whether the state prisoner was given the opportunity for full and fair litigation of his Fourth Amendment claim."). A state prisoner has not had a full and fair opportunity to litigate his Fourth Amendment claim in only two circumstances: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

Petitioner has not established that New York lacks adequate protective procedures for redressing Fourth Amendment violations. The Fourth Amendment requires "only that the state courts provide an opportunity for full and fair litigation of a fourth amendment claim." Id. at 71. In light of this requirement, "federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. CRIM. PROC. LAW § 710.10 et seq., as being facially adequate." Id. at 70 n.1 (internal citations omitted); see Gates, 568 F.2d at 837 (detailing New York's procedural mechanisms for suppression of unconstitutionally obtained evidence).

Nor can Petitioner argue that an unconscionable breakdown in the underlying process precluded him from availing

himself of these facially adequate procedures. In fact, Petitioner moved to suppress the slim jim, his statements, and other evidence on the grounds that, because the arresting officer told him he was being arrested on the federal warrant, and because he was never arraigned on that warrant, the evidence was the product of an illegal arrest. In response to Petitioner's motion, the trial judge conducted a hearing on the issue after which he ruled that the arrest and seizure were legal. This decision was reviewed on the merits and affirmed by the Appellate Division on direct appeal. Thus, Petitioner has had a full and fair opportunity to litigate his Fourth Amendment claim in state court. See, e.g., Williams v. Artus, 691 F. Supp. 2d 515, 529 (S.D.N.Y. 2010) (finding that petitioner had a full and fair opportunity where criminal procedure law afforded right to file a motion to suppress evidence, where petitioner's motion resulted in a pretrial hearing on the issue, and where the alleged violation was subject to review on direct appeal); Campbell v. Fischer, 275 F. Supp. 2d 321, 330 (E.D.N.Y. 2003) (finding a full and fair opportunity to litigate Fourth Amendment claim where a pretrial suppression hearing was conducted and petitioner also raised the issue on direct appeal). Therefore, because New York affords criminal defendants adequate remedial procedures, and because Petitioner

was, in fact, afforded those procedures, this Court lacks the authority to review Petitioner's Fourth Amendment claim.

CONCLUSION

For the reasons stated above, the Petition is DENIED. The Court will not issue a certificate of appealability. The Clerk of the Court is directed to mark this matter CLOSED.


SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      August _18_, 2010
            Central Islip, New York